**STATE of Minnesota, Respondent,**

v.

**Kent Richard JONES, Appellant.**

No. A07–457.

Supreme Court of Minnesota.

July 31, 2008.

Mark D. Nyvold, St. Paul, MN, for appellant.

Lori Swanson, Atty. Gen., Kimberly R. Parker, Asst. Atty. Gen., St. Paul, MN, Kathleen Heaney, Sherburne County Atty., Elk River, MN, for respondent.

## OPINION

DIETZEN, Justice.

Following a jury trial, appellant Kent Richard Jones was found guilty of first-degree murder committed during the course of a criminal sexual assault, second-degree intentional murder, and first-degree criminal sexual conduct. Jones asserts that numerous instances of unobjected-to prosecutorial misconduct deprived him of a fair trial, that the district court erroneously admitted testimony in violation of the marital communications privilege, and that the court erroneously excluded evidence supporting his defense of an alternative perpetrator. In a supplementary pro se brief, Jones also asserts that the search warrant for his DNA was unsupported by probable cause and that numerous errors during the grand jury proceedings require dismissal of his indictment. Because Jones was not deprived of a fair trial and the district court properly applied the applicable evidentiary standards, we affirm.

Linda and Charles Jensen were married in 1971, divorced 8 years later, and remarried in 1991. They lived together with her young son and infant daughter in Big Lake, Minnesota. Their oldest son, Andrew, lived nearby. Appellant Kent Richard Jones and his wife Deborah lived a short distance from the Jensens' home.

On February 24, 1992, Charles discovered Linda's dead body in the bedroom of their home. Her nude body was partially covered by a comforter, which had been pinned to her chest with a knife. Charles immediately notified law enforcement officials, who arrived at the scene shortly thereafter. The police conducted an extensive investigation, but found almost no physical evidence in the home. The sheets from the bed were missing and have never been located, no fingerprints discovered in the home were of sufficient quality to yield an identification, and a K–9 unit survey of the area around the Jensen residence uncovered no other evidence.

An autopsy revealed that Linda had been beaten, sexually assaulted anally and vaginally, strangled, and slowly stabbed numerous times in the chest. A quantity of semen was recovered from Linda's body, and it was determined that she had been killed in the course of a criminal sexual assault. Based on a number of factors, the medical examiner concluded that Linda died sometime on the morning

of February 24, likely between 8:00 and 10:00 a.m.

Law enforcement officers initially focused their investigation on Charles and Andrew Jensen, whom they considered the most likely suspects. Officers also interviewed residents of the neighborhood to determine if anyone had observed anything unusual on the morning of the murder. Jones was briefly interviewed at his residence, but did not mention that he knew Linda or her family, or that he had seen any suspicious activity on the day of the murder.

Semen found at the crime scene yielded a DNA profile, which was compared against samples from approximately 80 suspects and a national DNA database, but no match was found. Investigators reviewed over 1,000 other possible leads, but without a DNA match or other evidence to identify a perpetrator, the case went cold.

In 2000, a citizen informant came forward with information connecting Jones to Linda Jensen's murder. Subsequently, a search warrant was obtained for a sample of Jones's DNA. Testing of that sample revealed that Jones's DNA matched that of the semen found on Linda's body.

The State convened a grand jury, which indicted Jones for first-degree murder committed during the course of criminal sexual conduct, in violation of Minn.Stat. § 609.185(2) (1990); second-degree intentional murder, in violation of Minn.Stat. § 609.19(1) (1990); and first-degree criminal sexual conduct, in violation of Minn. Stat. § 609.342, subd. 1(e)(i) (2006). That indictment was subsequently quashed, but a second grand jury again indicted Jones on all three counts. Jones moved to dismiss the second indictment, but his motion was denied.

The first trial commenced in November 2001. Jones testified in his defense and admitted that he had known Linda Jensen and that they had engaged in a brief extramarital affair. The semen found on Linda, he claimed, had been deposited when the two had intercourse the day before the murder. Following the trial, the jury found Jones guilty of all three counts of the indictment. Subsequently, this court reversed that conviction, concluding, inter alia, that the district court erroneously excluded alternative perpetrator evidence. *State v. Jones,* 678 N.W.2d 1, 21, 26 (Minn. 2004) (*Jones I* ). The case was remanded for retrial. *Id.* at 21.

Before the second trial, Jones was interviewed by law enforcement. During that interview, Jones admitted that he had sexual intercourse with Linda on the morning of her murder, not the night before as he had earlier claimed.

At the second trial, the State presented evidence that Jones's DNA matched the semen in Linda Jensen's body, and investigators testified regarding the changes in Jones's story over the course of their investigation. Jones also testified in his own defense. Jones claimed that he lied at the first trial based on discussions with his counsel, and because he feared he would be convicted if he admitted being with Linda on the morning of her death. He also claimed to have seen an unidentified truck pull into the Jensens' driveway shortly after he left the Jensens' home on the morning Linda was killed. Jones attempted to paint Charles Jensen as an alternative perpetrator, but Charles testified that he was elsewhere for most of the day, and his alibi was corroborated by a number of witnesses and documentary evidence. During cross-examination, the prosecution pointed out the inconsistencies in Jones's story and his history of dishonest behavior, as well as the fact that Jones admitted perjuring himself at his first trial. The jury returned guilty verdicts on

all three counts of the indictment. This appeal followed.

## I.

■ Jones argues that prosecutorial misconduct occurred during the trial that deprived him of a fair trial. "Prosecutors have an affirmative obligation to ensure that a defendant receives a fair trial." *State v. Henderson,* 620 N.W.2d 688, 701–02 (Minn.2001). When this court considers allegations of prosecutorial misconduct, our primary concern is whether such misconduct deprived the defendant of his right to a fair trial. *State v. Ramey,* 721 N.W.2d 294, 300 (Minn.2006). Jones concedes that he failed to object at trial to the alleged misconduct. Consequently, our review is limited to a plain-error analysis. *Id.* at 299; *see* Minn. R.Crim. P. 31.02.

■ Before an appellate court reviews unobjected-to prosecutorial conduct for error, there must be (1) error; (2) that is plain; (3) that affects substantial rights. *State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998). An error is "plain" if it is clear or obvious. *State v. Strommen,* 648 N.W.2d 681, 688 (Minn.2002) (citing *United States v. Olano,* 507 U.S. at 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). Usually, prosecutorial error is clear or obvious if the prosecutor's conduct contravenes case law, a rule, or a standard of conduct. *Ramey,* 721 N.W.2d at 302. "[W]hen the defendant demonstrates that the prosecutor's conduct constitutes an error that is plain, the burden [shifts] to the state to demonstrate lack of prejudice; that is, the misconduct did not affect substantial rights." *Id.* In this context, "lack of prejudice" means "that there is no reasonable likelihood that the absence of the misconduct in question would have had a significant effect on the verdict of the jury." *Id.* (internal quotation marks omitted). Essentially, Jones argues that the prosecutor engaged in four different types of misconduct during the trial. We now turn to those allegations.

### A. Violations of Fourth and Fifth Amendment Rights

■ Jones argues that the prosecutor elicited testimony that police executed a DNA search warrant upon a suspect who had not consented to a search, and then elicited testimony from an officer that a DNA search warrant was also executed on Jones. Jones asserts that this testimony violated his Fourth Amendment right against unreasonable search and seizure, and "unfairly implied to the jurors" that his withholding of consent stemmed from his guilt. The State counters that no testimony was presented that Jones refused to consent to a search.

■■ The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." It is undisputed that requiring a defendant to provide a blood sample for DNA analysis constitutes a Fourth Amendment search. *See Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 616–18, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (concluding that the taking of a blood, urine, or breath sample constitutes a search under the Fourth Amendment); *In re Welfare of J.W.K.,* 583 N.W.2d 752, 754–55 (Minn. 1998). Absent exceptions not applicable here, a warrant supported by probable cause is necessary to obtain a sample of an individual's DNA. *See State v. Gilbert,* 262 N.W.2d 334, 340 (Minn.1977) (noting that a search warrant is typically required for a sample of blood). The federal and state constitutions' guarantees of due process grant the accused "the right to a fair opportunity to defend against the State's

accusations." *Chambers v. Mississippi,* 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *see Jones I,* 678 N.W.2d at 15–16. Thus, Jones had the right to require a warrant before providing a sample of his DNA.

■ It is a violation of the defendant's right to due process for a prosecutor to comment on a defendant's failure to consent to a warrantless search. *See United States v. Runyan,* 290 F.3d 223, 249 (5th Cir.2002) ("[T]he circuit courts that have directly addressed this question have unanimously held that a defendant's refusal to consent to a warrantless search may not be presented as evidence of guilt."); *Jones I,* 678 N.W.2d at 12 n. 3 (explaining that it is improper to use a defendant's refusal to consent to a search against the defendant). In this case, the district court had ruled before trial that the prosecutor could not comment on Jones's refusal to provide a saliva sample to law enforcement.

Consequently, it would have been improper for the prosecutor to present *direct* evidence that Jones failed to consent to a search. But Jones makes no argument that the prosecution presented such evidence. Instead, Jones argues that, by the nature of the questions posed to the witnesses, the prosecutor invited an inference that Jones failed to consent to a search. Jones provides no authority to support his position that an inference is sufficient to constitute a violation of due process. Based on our review of existing law, we conclude that an inference based on little more than speculation is not sufficient to constitute a violation of due process. Thus, the prosecutor did not commit an error that was plain when he elicited the testimony.

■ Jones next argues that the prosecutor improperly elicited testimony that other individuals voluntarily produced samples of their DNA. The State argues that, because Jones defended the charges on the ground that the crime was committed by an alternative perpetrator, the testimony was necessary to exculpate the alleged alternative perpetrators.

■ A defendant's right to due process includes the right to introduce evidence—known as alternative perpetrator evidence—that shows that someone else committed the crime. *State v. Blom,* 682 N.W.2d 578, 621 (Minn.2004); *Jones I,* 678 N.W.2d at 15–16; *see State v. Hawkins,* 260 N.W.2d 150, 158–59 (Minn.1977). But the alternative perpetrator defense opens the door for the prosecutor to present testimony exculpating the alleged alternative perpetrators. For example, in *United States v. McNatt,* 931 F.2d 251, 257–58 (4th Cir.1991), the Fourth Circuit concluded that, when a defendant claimed that incriminating evidence had been planted in the trunk of his car by law enforcement, the government was permitted to present testimony that the defendant failed to consent to a search of his trunk. As in *McNatt,* the prosecution in this case should be permitted to introduce testimony that potential perpetrators voluntarily provided DNA that exculpated them. We express reservations, however, with the prosecutor's emphasis on the fact that the DNA samples were voluntarily produced rather than simply stating that such samples had been produced and exculpated the suspects.[1]

But even if introduction of the testimony was an error that was plain, we conclude that the State has demonstrated that the error was not prejudicial. The jury was

---

1. Because we conclude that the prosecutor's conduct here was justified in light of Jones's allegations of an alternative perpetrator, we express no opinion regarding whether such conduct would be permissible absent such allegations.

informed that a warrant was acquired to search the Jensen residence, and that sometimes warrants are acquired to make certain a search is conducted legally and to prevent a later revocation of consent. Thus, the jury was aware that search warrants are acquired for reasons other than the invocation of one's constitutional rights. Because the jury was never informed that Jones had refused to consent to a search, the mere mention that other suspects did provide such consent would not have implicated Jones's failure to consent. On this record, we conclude that the evidence in question was not prejudicial and did not have a substantial effect on the jury verdict.

▆▆▆ Jones also argues that the prosecutor improperly used Jones's pre-arrest silence to imply his guilt in violation of his Fifth Amendment right against compelled self-incrimination. Initially he argues that the prosecutor improperly informed the jury that, during an interview with the police the day after the murder, Jones did not disclose that he knew Linda or that he observed suspicious activity at her home on the day of the murder.

▆▆▆▆ The Fifth Amendment provides that a defendant cannot "be compelled in any criminal case to be a witness against himself." It guarantees the accused the right to remain silent during the criminal trial, and prevents the prosecution from commenting on the silence of a defendant who asserts that right. *Griffin v. California*, 380 U.S. 609, 613–15, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). In *Jenkins v.*

*Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), however, the Supreme Court stated that " 'it has long been held that a defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination.' " *Id.* at 236 n. 3, 100 S.Ct. 2124 (quoting *McGautha v. California*, 402 U.S. 183, 215, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971)). The Court went on to conclude "that the Fifth Amendment is not violated by the use of pre-arrest silence to impeach a criminal defendant's credibility." *Id.* at 238, 100 S.Ct. 2124. In *Fletcher v. Weir*, 455 U.S. 603, 605–06, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982), the Supreme Court noted that its decisions prohibiting use of a defendant's silence turned on the government's inducement of that silence by *Miranda* warnings or otherwise.

But it is unsettled whether a prosecutor may elicit testimony of pre-arrest silence before a defendant testifies at trial. The Supreme Court has not yet addressed the question, and one Justice has indicated that the clear language of the Fifth Amendment is not implicated by mere silence, but by assertion of the privilege in the face of government compulsion to speak. *See Jenkins*, 447 U.S. at 243–44, 100 S.Ct. 2124 (Stevens, J., concurring in the judgment). Further, this court has not determined on any previous occasion whether it is per se a violation of the constitutional right against self-incrimination for a prosecutor to elicit testimony of a defendant's pre-arrest silence before the defendant testifies at trial.[2] *See State v.*

---

2. That is not to say that we have not addressed the constitutional right against self-incrimination in other circumstances. *See, e.g., State v. Dobbins*, 725 N.W.2d 492, 509–10 (Minn.2006) (silence used as impeachment); *State v. Penkaty*, 708 N.W.2d 185, 199 (Minn. 2006) (post-arrest failure to testify before grand jury); *State v. Sutherlin*, 396 N.W.2d

238, 242 (Minn.1986) (post-arrest silence); *State v. McCullum*, 289 N.W.2d 89, 92 (Minn. 1979) (same); *State v. Billups*, 264 N.W.2d 137, 139 (Minn.1978) (post-arrest silence on advice of counsel); *State v. Roberts*, 296 Minn. 347, 349–53, 208 N.W.2d 744, 745–48 (1973) (post-arrest silence).

*Morrison,* 351 N.W.2d 359, 362 n. 1 (Minn. 1984); *State v. Goar,* 295 N.W.2d 633, 634 n. 1 (Minn.1980). Lastly, the federal circuits have split on whether it is constitutionally permissible for a prosecutor to comment on a defendant's pre-arrest, pre-*Miranda* silence. *See Combs v. Coyle,* 205 F.3d 269, 282–83 (6th Cir.2000). Some circuits have concluded that the Fifth Amendment does not prohibit comment on pre-arrest silence. *See, e.g., United States v. Oplinger,* 150 F.3d 1061, 1065–67 (9th Cir.1998). But other circuits have concluded to the contrary. *See, e.g., United States ex rel. Savory v. Lane,* 832 F.2d 1011, 1016–18 (7th Cir.1987).

Under our plain error analysis, a defendant must establish an error that was plain before we will review the alleged misconduct. *Ramey,* 721 N.W.2d at 299; *State v. Jackson,* 714 N.W.2d 681, 690 (Minn.2006) (explaining that to satisfy the second prong of the plain error test "the error must be plain at the time of the appeal"). Because neither this court nor the federal courts have conclusively resolved this issue, we cannot say that the prosecutor "contravene[d] case law, a rule, or a standard of conduct." *Ramey,* 721 N.W.2d at 302; *see United States v. Whab,* 355 F.3d 155, 158 (2d Cir.2004) ("Certainly, an error cannot be deemed 'plain,' in the absence of binding precedent, where there is a genuine dispute among the [courts]."). Therefore, the prosecutor did not commit an error that was "clear" or "obvious." Since Jones did not raise this objection at trial, it is not properly before us, and we decline to address it.[3]

■■ Jones alleges that the prosecutor improperly elicited testimony from law en-

forcement that they had contact with Jones at a car dealership and following a traffic stop, at which times Jones failed to mention anything about Linda's murder. While we question the relevance of this testimony, we conclude that the elicitation of this testimony did not constitute plain error. *See Whab,* 355 F.3d at 158; *Jackson,* 714 N.W.2d at 690.

Jones also asserts that, during the State's opening statement, the prosecutor improperly referenced an incident in which Jones returned home unexpectedly, surprising his wife and causing her to fear that Linda's murderer was in the home. Jones argues that the prosecutor's statement unfairly burdened his decision whether to testify at trial. But during the opening statement, the prosecutor made no connection between the incident and Jones's pre-arrest silence. Thus, we see no plain error under the Fifth Amendment.[4] Also, the prosecutor cross-examined Jones regarding this incident and attempted to impeach him on his silence. While this incident has questionable relevance, it was permissible impeachment under *Jenkins.*

### B. Prosecutorial Misconduct During Examination of Witnesses

■■ Jones alleges that, during direct and cross-examination, the prosecutor committed six acts of misconduct that deprived him of a fair trial. First, Jones argues that the prosecutor improperly elicited testimony that Jones's wife had an attorney present during an interview with law enforcement, thereby "suggest[ing] to the jury that [she] had counsel present

---

**3.** Jones conceded at oral argument that his pre-arrest silence was not induced by any government action, giving us no opportunity to determine the effect, if any, of such inducement on our analysis.

**4.** Even if Jones's right to remain silent had been implicated, this conduct would not have constituted plain error, for the reasons set forth above. *See Whab,* 355 F.3d at 158.

because she or her husband had something to hide." But Jones fails to present any law indicating that such questioning is improper, and only speculates as to the negative impact of the questioning. Thus, we cannot conclude that the prosecutor's conduct constituted an error, much less an error that was plain.

Second, Jones contends that the prosecutor committed misconduct by eliciting sympathy for Charles and Andrew Jensen regarding the family hardships caused by Linda's murder. Jones argues that the testimony prejudiced his ability to establish "Mr. Jensen as an alternative perpetrator." A prosecutor is permitted "to talk about what the victim suffers and to talk about accountability, in order to help persuade the jury not to return a verdict based on sympathy for the defendant." *State v. Montjoy*, 366 N.W.2d 103, 109 (Minn.1985). But a prosecutor should not emphasize such matters "to such an extent as to divert the jury's attention from its true role of deciding whether the state has met its burden of proving defendant guilty beyond a reasonable doubt." *Id.* Here, the prosecutor asked only a few questions on this topic. Further, most of the questions were posed to Linda's husband, who Jones alleged was the perpetrator of the crime. We conclude that this questioning did not constitute error, much less error that was plain.

Third, Jones argues that the prosecutor improperly elicited testimony that Andrew Jensen took a polygraph examination, which invited the jury to conclude that Charles Jensen had also taken and passed a polygraph and that Jones had either failed or refused to take a polygraph test. The State responds that Andrew's answer to the prosecutor's question was uninvited.

Polygraph examinations are inadmissible. *See, e.g., State v. Riley*, 568 N.W.2d 518, 527 (Minn.1997); *State v. Anderson*, 379 N.W.2d 70, 79 (Minn.1985). Therefore, we consider whether this error prejudiced Jones. Here, the prosecutor did not highlight the response or make any further reference to it during the trial. Further, Jones's argument that Andrew's answer implied that Charles Jensen passed the polygraph and Jones did not is pure speculation, and we reject it. Thus, the State has demonstrated that Andrew's answer was not prejudicial and did not affect Jones's substantial rights. *See State v. Wren*, 738 N.W.2d 378, 394 (Minn.2007) (finding error harmless where erroneously admitted testimony was brief and "was not persuasive evidence" of defendant's guilt).

Fourth, Jones argues that the prosecutor improperly elicited testimony of Jones's aggressive sales tactics as a car salesman to imply that he acted consistently with his aggressive character by murdering Linda. *See* Minn. R. Evid. 404(a) (evidence of a character trait not admissible to prove action in conformity with the trait on a particular occasion). Jones relies on *State v. Ray*, 659 N.W.2d 736 (Minn.2003), to support his argument. In *Ray*, the prosecutor persistently asked leading questions aimed to elicit testimony that the district court had previously ruled inadmissible. *Id.* at 744–45. But Jones has alleged no such conduct in this case. While we do not endorse the prosecution's elicitation of this testimony, our independent review of the record reveals nothing to substantiate Jones's claim that the prosecutor mentioned Jones's sales tactics to inflame the jury against him.

Fifth, Jones argues that it was misconduct to elicit testimony that he engaged in an extramarital affair with another woman while his wife was in the hospital with an emotional breakdown. A

prosecutor may not make "gratuitous character attacks" on a defendant. *State v. DeWald*, 463 N.W.2d 741, 745 (Minn. 1990). While the mention of Jones's wife's hospitalization at the time of his affair undoubtedly painted Jones in a bad light, we cannot say that it constituted a "gratuitous" or unfair attack on his character.[5]

■ Sixth, Jones argues that the prosecutor improperly asked him, "would you agree that * * * a reasonable person might well conclude that you would rather climb a tree and tell a falsehood than stand on the ground and tell the truth?" The State argues that the question concerned Jones's credibility and was based on Jones's own testimony.

■ It is well settled that a prosecutor may not give his own opinion of the credibility of a witness during closing argument. *State v. Mayhorn*, 720 N.W.2d 776, 786 (Minn.2006). Here, the prosecutor's question challenging Jones's veracity was extremely argumentative, and the State's attempt to justify it on the ground that it was linked to the perspective of a reasonable person lacks merit. But the State has demonstrated that this conduct did not prejudice Jones's right to a fair trial. Specifically, Jones's credibility and trustworthiness were seriously damaged by his admission that he had sex with Linda the morning of the murder and that he had changed his story several times between the murder and the second trial.

## C. Prosecutorial Misconduct During Closing Argument

■ Jones argues that five instances of prosecutorial misconduct occurred during closing argument. When reviewing claims of prosecutorial misconduct during closing argument, we consider the argument as a whole, "rather than focusing on 'particular phrases or remarks that may be taken out of context or given undue prominence.'" *State v. Leake*, 699 N.W.2d 312, 327 (Minn. 2005) (quoting *State v. Walsh*, 495 N.W.2d 602, 607 (Minn.1993)).

■ First, Jones argues that the prosecutor undermined the presumption of innocence. Specifically, the prosecutor argued that, if reasonable doubt means beyond all possibility of doubt, "society could never protect itself against those individuals who seek to deny their guilt in order to avoid the consequences of their own actions. Nor, Ladies and Gentlemen, does it mean doubt created by the ingenuity or the imagination * * * of counsel."

In *State v. Bolstad*, 686 N.W.2d 531, 544 (Minn.2004), we considered whether a prosecutor undermined the presumption of innocence. The prosecutor in *Bolstad* argued, "[I]f we had to prove guilt beyond all possibility of a doubt, we simply could never hold accountable those who deny their guilt in order to avoid being held responsible. Nor is [reasonable] doubt created by the imagination or ingenuity of one of the lawyers in the case." *Id.* In *Bolstad*, we declined to find reversible error, *id.*, and nothing in the record before us compels a different result here.

■ Second, Jones argues that the prosecutor improperly demeaned him by mocking him as a "great lover" and calling him "cheap." A prosecutor's closing argument need not be colorless, so long as it is

---

5. Perhaps the underlying facts at issue here could have been excluded as unduly prejudicial, but Jones has failed to raise that issue in his brief, thereby waiving any argument on that matter. *See Louden v. Louden*, 221 Minn. 338, 339, 22 N.W.2d 164, 166 (1946) (issues insufficiently briefed are deemed waived "and will not be considered on appeal unless prejudicial error is obvious on mere inspection").

based on the evidence or reasonable inferences from that evidence. *State v. Porter*, 526 N.W.2d 359, 363 (Minn.1995). Jones claimed at trial that he was a skilled lover and that Linda had come to him for "more spice." But other testimony was presented indicating that Jones had trouble maintaining an erection and that Linda was uninterested in an affair. Further, testimony was presented that, while on a date at a restaurant, Jones gave his date some flowers that he had taken from a nearby table. On this record, the prosecution's language, while colorful, was fairly based on the evidence.

Third, Jones contends that the prosecutor improperly argued that female jurors should rely on their experience of whether breast-feeding women have a menstrual cycle. The State responds that the prosecutor was countering Jones's claim that Linda was unconcerned about getting pregnant when they had intercourse because she was not fertile. It is improper to request that the jurors "put themselves in the shoes of the victim," *State v. Johnson*, 324 N.W.2d 199, 202 (Minn.1982), or "look at their own experiences as proof that the defendant's defense is not credible," *State v. Williams*, 525 N.W.2d 538, 549 (Minn.1994). In *Williams* the prosecutor had used the jurors' personal experiences to assert that the defendant had simply picked the only defense that would work. *Id.* at 548–49. But we also concluded in *Williams* that jurors "are free to (and undoubtedly do) bring their own experiences to bear in assessing the credibility of a defendant's claim." *Id.* at 549. Thus, it was not improper to ask the jury to consider whether Jones's testimony made sense in light of their experiences and common sense. On this record, we conclude that the prosecutor's argument did not constitute an error that was plain under *Williams*.

Fourth, Jones argues that the prosecutor improperly characterized his defense as an "old trick." The State concedes that such characterization "is probably improper," but argues that it was not prejudicial. "It is clearly improper for a prosecutor to suggest that the arguments of defense counsel are part of some sort of syndrome of standard arguments that one finds defense counsel making in 'cases of this sort.'" *State v. Salitros*, 499 N.W.2d 815, 818 (Minn.1993). Based on *Salitros*, we conclude that reference to the defense strategy as an "old trick" was an error that was plain.

Fifth, Jones contends that the prosecutor improperly argued that "lawyers don't tell witnesses what to say." The State admits the argument was improper, but contends that it was not prejudicial because the district court instructed the jury that the attorneys' remarks were not evidence, and because there was "ample" evidence impeaching Jones's credibility. It is improper to state as fact anything that "the evidence does not tend to prove." *State v. Bernstein*, 148 Minn. 301, 306, 181 N.W. 947, 949 (1921). This part of the prosecutor's closing argument constituted error that was plain.

Because Jones has established that plain error occurred during the prosecutor's closing argument, the burden shifts to the State to prove that the prosecutor's arguments that the defense's strategy was an "old trick" and that "lawyers don't tell witnesses what to say" were not prejudicial and did not affect the outcome of the trial. *See State v. Davis*, 735 N.W.2d 674, 681–82 (Minn.2007). In making this determination, "we consider the strength of the evidence against the defendant, the pervasiveness of the improper suggestions, and whether the defendant had an opportunity

to (or made efforts to) rebut the improper suggestions." *Id.* at 682.

The case against Jones was very strong. Jones admitted, and the evidence established, that he had sexual intercourse with Linda the morning of the murder. Jones's credibility was seriously undermined by the inconsistent statements he made to police and his admission that he perjured himself in the first trial. Jones's argument that Charles Jensen was the perpetrator of the murder was undermined because Charles had an alibi that was confirmed by the police. Further, Jones's contention that he had an affair with Linda was not supported by the record. Moreover, the two instances of misconduct we have identified were not a significant part of the State's closing argument, and Jones had the opportunity to correct the prosecutor's comments in his own closing argument. Also, the jury was instructed on the burden of proof, presumption of innocence, witness credibility, and the difference between evidence and the arguments of counsel. Thus, we conclude that the State has demonstrated that, viewed in light of the closing argument as a whole, the prosecutor's misconduct was not prejudicial and did not affect defendant's right to a fair trial.

In sum, we hold that Jones has failed to establish plain error under the Fourth and Fifth Amendments, and that the State has carried its burden of proof to show that the prosecutor's misconduct did not prejudice Jones's substantial rights.[6]

## II.

Jones argues that the district court erred by permitting Jones's wife to be cross-examined regarding Jones's ability to have sexual relations, in violation of the marital privilege statute and Minn. R. Evid. 403. The State argues that Jones waived the privilege by failing to assert it at trial.

The marital privilege statute provides two different types of marital privilege: (1) the privilege to prevent one spouse from testifying for or against the other during their marriage; and (2) the privilege to prevent one spouse from testifying at any time, during the marriage or after, concerning confidential interspousal communications made during the marriage. Minn. Stat. § 595.02, subd. 1(a) (2006); *State v. Gianakos,* 644 N.W.2d 409, 416 (Minn. 2002).

Jones called his wife as a witness at trial. When the topic of their sexual relations was raised on cross-examination, Jones's wife told the court that she did not think she should be required to answer the question. Jones did not object, and the court directed her to answer the prosecutor's question. Jones's failure to object at trial raises two separate issues. First, did his failure to object to the court's order that his wife answer the prosecutor's question constitute a *waiver of appellate review* of the alleged violation of the marital privilege statute? And did his failure to object constitute a *waiver of the marital privilege?* We consider each of these issues in turn.

 Jones argues that he did not waive his right to appellate review of the district court's alleged violation of the marital privilege statute. It is well established that a defendant who fails to object at trial ordinarily waives his right to have the

---

6. We have also considered the cumulative effect of the prosecutor's misconduct during direct examination, cross-examination, and closing arguments. *See Mayhorn,* 720 N.W.2d at 792 (reversing conviction based on cumulative impact of multiple errors). Even when the prosecutor's misconduct is viewed cumulatively, we conclude that the State has met its burden to establish that the misconduct did not prejudice Jones.

issue considered on appeal. *State v. Coleman*, 373 N.W.2d 777, 783 (Minn.1985). Conceding that he did not object, Jones contends that his wife's assertion of the privilege was sufficient to preserve the issue. We disagree. The marital privilege prevents one spouse from testifying at trial without the consent of the other. Thus, it is the non-testifying spouse who may assert the privilege to prevent the other spouse from testifying. Consequently, the marital privilege statute provided Jones's wife no basis for objecting to the prosecutor's question. Because Jones did not object at trial, he waived his right to appellate review of the district court's alleged violation of the marital privilege statute.

■ Despite this waiver, Jones may obtain appellate review of and relief from plain errors affecting substantial rights if those errors had the effect of depriving the defendant of a fair trial. *State v. Williams*, 525 N.W.2d 538, 544 (Minn. 1994). Under the plain error doctrine a defendant must establish both that there was an error and that the error was plain. *State v. Griller*, 583 N.W.2d 736, 740 (Minn.1998). An error is plain if it is clear or obvious. *State v. Reed*, 737 N.W.2d 572, 583 (Minn.2007). Not only must a defendant establish an error that was plain, the defendant must also demonstrate that the error affected his substantial rights. *Id.* at 583–84 (noting an exception to this requirement in prosecutorial misconduct cases). If a defendant establishes all three factors, we consider the fourth factor: "whether the error should be addressed 'to ensure fairness and the integrity of the judicial proceedings.'" *Id.* at 583 (quoting *Ramey*, 721 N.W.2d at 298).

Jones argues that he has satisfied the first prong of the plain error test because the district court committed "an error" when it directed Jones's wife to answer the prosecutor's question in violation of the marital privilege statute. But if failure to object to his wife testifying against him at trial constituted a *waiver of his marital privilege*, then the district court did not commit an error, much less an error that was plain, when it directed Jones's wife to answer the prosecutor's question.

■ Generally, failure to object by the non-testifying spouse constitutes a waiver of the marital privilege. *State v. Clark*, 296 N.W.2d 372, 376 (Minn.1980). We have set the marital privilege waiver threshold at a level that allows the fact finder maximum access to relevant evidence. *State v. Johnson*, 463 N.W.2d 527, 534 (Minn.1990). This reflects the law's sound "'policy of protecting the marital relationship without erecting artificial barriers to the ascertainment of truth.'" *Gianakos*, 644 N.W.2d at 419 (quoting *State v. Hannuksela*, 452 N.W.2d 668, 676 (Minn. 1990)). But in *State v. Penkaty*, 708 N.W.2d 185, 204 (Minn.2006), this court concluded that, when the trial record clearly demonstrated, through statements made on the record by defense counsel, that the defendant did not object to his wife's testimony based on defense counsel's mistaken belief that under the special circumstances of the case the defendant did not have a marital privilege, the defendant's failure to object did not constitute a waiver of the marital privilege.

Relying on *Penkaty*, Jones argues that his failure to object at trial did not constitute a waiver of his marital privilege. Unlike *Penkaty*, there is nothing in this record to suggest that Jones or his attorney believed that Jones could not exercise his marital privilege to prevent his wife's testimony, nor does Jones make such a claim on appeal. Thus, the special circumstances involved in *Penkaty* do not exist in this case. As a result, we conclude that Jones waived his marital privilege when he failed to object to his wife testifying

against him at trial. Consequently, the district court did not commit an error, much less an error that was plain, when it directed Jones's wife to answer the prosecutor's question about the couple's sexual relations.

 Jones also asserts that this testimony was inadmissible under Minn. R. Evid. 403. The State responds that Jones's sexual conduct was relevant and that the defense opened the door to this testimony. Under Minn. R. Evid. 403(a), "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Because Jones raised no objection to this testimony, our review is limited to a plain error analysis. *See Griller*, 583 N.W.2d at 740.

On this record, we cannot conclude that it was an error, much less an error that was plain, to admit the testimony. The crime charged included a sexual assault. Jones presented testimony that Linda had an illicit affair and consensual sexual relations with him. Thus, Jones's ability or inability to engage in sexual conduct was relevant and had probative value. *Cf. State v. Washington*, 693 N.W.2d 195, 200–03 (Minn.2005) (noting that evidence of past criminal sexual conduct may be admitted in prosecutions for criminal sexual conduct).

Further, we see no reasonable likelihood that the testimony had a significant effect on the jury verdict. The mention of Jones's sexual relations with his wife was brief and revealed that Jones had some difficulty in performing sexually. Such testimony might have *helped* Jones's defense by undermining the State's effort to portray him as a violent sexual predator. To the extent that such testimony focused the jury's attention on Jones's sexuality, such focus was unavoidable. During cross-examination, Jones repeated the substance of his wife's testimony, thereby lessening the harmful impact of any error.

### III.

Jones argues that his constitutional right to present a defense was infringed by the erroneous exclusion of evidence concerning (1) Charles Jensen's past abuse of Linda Jensen; and (2) Linda Jensen's statements to a realtor that she was contemplating a divorce. The State responds that the exclusion of this evidence did not constitute error, and that any error would have been harmless.

 A criminal defendant has a constitutional right to "a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). That right encompasses, among other things, "the right to present the defendant's version of the facts * * * to the jury so it may decide where the truth lies." *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). In presenting a defense, however, "the accused * * * must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). When evidence is erroneously excluded in violation of the defendant's right to present a defense, a court inquires as to "whether, 'assuming that the damaging potential of the [excluded evidence] were fully realized, * * * the error was harmless beyond a reasonable doubt.' " *State v. Post*, 512 N.W.2d 99, 102 (Minn.1994) (alteration in original) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 683–84, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).

 At trial, Jones offered hearsay evidence indicating that Charles Jensen had physically and sexually abused Linda

on unspecified occasions between 1977 and 1991. Such evidence of an alternative perpetrator's prior bad acts is otherwise known as "reverse-*Spreigl*" evidence. *See Jones I*, 678 N.W.2d at 16. The district court ruled this evidence inadmissible because, among other reasons, the alleged bad acts had not been proven by clear and convincing evidence. Jones argues that the proffered statements constituted clear and convincing evidence because Linda had no reason to lie when she related this abuse to her friends. The State argues that the exclusion of this evidence was proper because the allegations were not supported by clear and convincing evidence.

■■■■ Reverse-*Spreigl* evidence is admissible only if the defendant has shown (1) clear and convincing evidence that the alleged alternative perpetrator participated in the incident; (2) that the incident is relevant and material to defendant's case; and (3) that the probative value of the evidence outweighs its potential for unfair prejudice. *Jones I*, 678 N.W.2d at 16–17. "Clear and convincing evidence" is evidence that is "more than a preponderance of the evidence but less than proof beyond a reasonable doubt." *Weber v. Anderson*, 269 N.W.2d 892, 895 (Minn.1978). Such proof is shown when "the truth of the facts asserted is 'highly probable.' " *Id.*

Jones failed to show a high probability that Charles Jensen committed the alleged prior bad acts. Instead, he presented only two vague hearsay statements as proof of those acts. Because nothing indicated that the occurrence of the prior bad acts was "highly probable," the district court did not infringe on Jones's right to present a

defense. *See Chambers*, 410 U.S. at 302, 93 S.Ct. 1038.[7]

The statements' lack of detail would also render their exclusion harmless beyond a reasonable doubt, given the unlikelihood that the verdict would have been changed by an unsubstantiated allegation of past abuse. Thus, even if the exclusion of this testimony constituted error, we conclude that such error was harmless.

■■■■ Jones also sought to submit a hearsay statement by real estate agent Melinda Anderson indicating that Linda had contemplated a divorce some time prior to her murder. Jones argued that this statement constituted state-of-mind hearsay under Minn. R. Evid. 803(3), lending support to his claim that he and Jensen had engaged in a consensual extramarital affair.

According to the statement, Anderson contacted police in November of 2006 and stated that, 6 months before Linda's murder, Linda had requested a free market analysis of her home, that Anderson followed up with Linda, and that Linda told Anderson that she might be getting a divorce. Anderson questioned the truthfulness of the information given by customers in the real estate business, however, noting that Linda had seemed very "wishy-washy" and had retreated from her comment about a possible divorce. Anderson had no further contact with Linda following this discussion. The district court excluded this statement because it determined that the statement was untrustworthy.

Under Minn. R. Evid. 803(3), a hearsay statement is admissible if it is a "statement

---

7. While we noted in *Jones I* that the "clear and convincing evidence" standard may be unconstitutionally burdensome in some instances, 678 N.W.2d at 17 n. 6, there is no indication that any such burden has been imposed here—given the lack of proof offered by Jones, it seems unlikely that past abuse could have been shown by even a mere preponderance of the evidence.

of the declarant's then existing state of mind." Admissibility under Rule 803(3) "also turns on weighing probative value against the danger of unfair prejudice." *State v. DeRosier,* 695 N.W.2d 97, 105 (Minn.2005); *see* Minn. R. Evid. 403. Jones concedes that the trustworthiness of a statement goes to its probative value.

On this record, we conclude that the district court properly applied Rule 803(3). The record supports the district court's conclusion that the testimony was not trustworthy. The statement was not reported to the police until nearly 15 years after the murder, and the witness herself questioned its veracity. Thus, the court did not infringe on Jones's constitutional right to present a defense. *See Chambers,* 410 U.S. at 302, 93 S.Ct. 1038.

Even if the district court erred, such error was harmless beyond a reasonable doubt. The excluded statement is open to a multitude of explanations, such as Linda's possible desire to get a free market analysis, and would, at best, provide weak support for Jones's claim that he and Linda had engaged in a consensual affair. Any impeachment value of the statement would have been negligible, given the ample testimony regarding the strength of the Jensen marriage.

### IV.

■ In a pro se brief, Jones challenges the validity of the search warrant under which his DNA was acquired. He also argues that the indictment is faulty and should be dismissed. The State responds that the search warrant may not be challenged because this court upheld that warrant's validity in *Jones I* and argues that the remainder of the claims are barred under *State v. Knaffla,* 309 Minn. 246, 243 N.W.2d 737 (1976).

■ "[W]hen a case returns to an appellate court after remand, the matters raised and resolved in the original appeal that resulted in the remand, and any claims that were known but not raised in the original appeal, will not be considered." *State v. Greer,* 662 N.W.2d 121, 125 (Minn. 2003). Similarly, claims of which a defendant should have known at the time of the original appeal will not be considered on a subsequent appeal. *Cf. Black v. State,* 560 N.W.2d 83, 85 (Minn.1997).

In accord with the reasoning underlying *Greer,* none of Jones's pro se claims will be considered in this second direct appeal. In *Jones I* we held that sufficient probable cause existed to issue the warrant for the acquisition of Jones's DNA. 678 N.W.2d at 13. Jones was aware of his claim that exculpatory evidence was not presented to the grand jury—that claim was raised in a previous challenge to the indictment. Jones's other claims all involve alleged flaws in the grand jury proceedings of which he should have been aware at the time of his first appeal. Because Jones's pro se claims either were addressed in, were known at the time of, or should have been known at the time of, his first appeal, they are *Greer*-barred.

Affirmed.

MAGNUSON, C.J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.